IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES           )
                          )
                          )
      v.              )    Criminal Action No. 06-07
                          )
DANIEL D. MONTE,       )
THOMAS J. COUSAR,      )
CATHERINE BRADICA,    )
        Defendants.  )

MEMORANDUM

Gary L. Lancaster,
District Judge.                     June *13*, 2007

     Defendants Bradica, Cousar and Monte have been indicted on numerous counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2, major fraud against the government in violation of 18 U.S.C. §§ 1031 and 2, and conspiracy in violation of 18 U.S.C. § 371. Defendants have filed a number of pre-trial motions.

     Defendant Monte has filed a motion to suppress statements he made to the government on three occasions. Defendant Monte also filed a motion for a bill of particulars, a motion for discovery and a related motion to compel, all of which are joined by defendant Bradica and defendant Cousar. Defendant Bradica has filed a motion to dismiss Count Thirty-Seven of the indictment, which is joined by defendant Monte and defendant Cousar, and a motion for severance of counts, which is joined by defendant Cousar.

     The Court held a hearing on May 24, 2007 to address the pre-trial motions. The court denied defendant Monte's motion to

suppress and motion for a bill of particulars. Defendants voluntarily dismissed the motion to compel and the motion for discovery. The court took under advisement defendants' motion for severance of counts and motion to dismiss Count Thirty-Seven. We will address each motion in turn.

I.   <u>MOTION TO SUPPRESS</u>

The Court received witness testimony regarding defendant Monte's motion to suppress. Internal Revenue Service ("IRS") Special Agent Richard Eaton, Federal Bureau of Investigations ("FBI") Special Agent Leanna Saler, IRS Special Agent Kevin O'Donnell, IRS Special Agent Charles Dahlman, and IRS Special Agent Edward Wirth testified at the hearing. Defendant Monte also testified at the hearing. I have taken into account the traditional methods of assessing the credibility of a witness: their appearance, behavior and manner while testifying, as well as the quality of the witnesses' knowledge, understanding, and memory. Based on all these factors, the Court finds the following:

1. <u>December 11, 2003 Interview</u>

On December 11, 2003, government agents executed a search warrant for the business offices and warehouse of Capco Contracting Company ("Capco") in Virginia. The "Capco

investigation"[1] was headed by the Internal Revenue Service in the Western District of Pennsylvania, but the search warrant was conducted jointly by IRS, FBI and DCIS ("Defense Criminal Investigative Service") agents from Pittsburgh and Virginia.

IRS Special Agent Edward Wirth was the lead investigating agent for the Capco case and IRS Special Agent Kevin O'Donnell was the lead agent on the execution of the search warrant at Capco's Alexandria, Virginia office. Prior to the execution of the search warrant, government agents were given a list of employees that may be present at the work site. Agents were assigned to specific employees whom they should seek to interview.

The search warrant was executed at about 6:30am on December 11, 2003. Defendant Monte arrived at the site at about 7:00am. Upon his arrival, defendant Monte met IRS Special Agent O'Donnell, who was greeting employees as they arrived. Agent O'Donnell told defendant that they were executing a search warrant as part of an investigation of Capco, and asked defendant if he would agree to be interviewed. Defendant agreed. Defendant was never restrained or handcuffed. Defendant was not patted down nor was he subject to any bodily search. A government agent

---

[1] We note that Capco Contracting Company is not a defendant in this case. For ease of reference, however, we refer to this case and investigation as the "Capco case" or "Capco investigation."

3

asked defendant whether he could search defendant's vehicle to which defendant responded "You're welcome to."

Defendant Monte was interviewed by three agents, IRS Special Agent Richard Eaton, DCIS Special Agent Janice Horst and FBI Special Agent Leanna Saler, in a conference room by the building's lobby. Defendant was not given <u>Miranda</u> warnings. Defendant was interviewed for approximately two hours. Defendant left the room on at least one occasion to search for some documents. At that time, pursuant to standard protocol, he was accompanied by a government agent. For safety reasons, any person on the premises who was not part of the search team was escorted at all times by an agent. Although he was escorted by an agent, defendant was never physically restrained.

The interview was by all accounts very cordial. In fact, defendant testified that he was cordial and cooperative at all times. When asked whether he had any sense of "intimidation or concern or anxiety," defendant responded: "Oh, I mean, this is not something that occurs every day, I have never had this - - I mean this was very -- it was a calm situation, but stressful, very stressful." Defendant further testified that it would be stressful for anyone to arrive at their place of employment and find a number of federal agents executing a search warrant.

There is some dispute regarding whether defendant was allowed to leave the premises. Defendant testified that he was

4

told he had to stay to sign an inventory list and secure the premises at the end of the search. According to defendant, he never left the premises. Government agents testified credibly that defendant did leave the premises and was called back after they were finished with the search to secure the premises. The Court credits Special Agent O'Donnell's testimony that defendant said he had to leave to pick up his daughter. Agent O'Donnell requested defendant's cell phone number so that he could call defendant to secure the facility after they finished the search. Agent O'Donnell specifically recalled calling defendant on his cell phone to ask him to return and lock the facility. This was corroborated by Special Agent Dahlmann who testified that at the conclusion of the search, agents were looking for defendant's cell phone number so he would return to the offices and lock up.

After he returned to the offices, defendant signed an inventory sheet indicating that various equipment had been returned to the search site and locked the premises.

2. <u>January 5, 2004 Telephone Interview</u>

Defendant Monte received a subpoena stating he had to testify before a grand jury in Pittsburgh, Pennsylvania on January 8, 2004. Assistant U.S. Attorney ("AUSA") Carolyn Bloch's name and number appeared on the subpoena. Defendant Monte called and left a message for AUSA Bloch to verify whether he in fact had to appear before the grand jury. The call was returned by

Special Agent Wirth who informed defendant that he did have to testify before the grand jury on January 8, 2004. Agent Wirth then asked defendant whether he had an attorney, to which defendant said no. Agent Wirth then informed defendant that defendant had to be truthful during his grand jury testimony. Defendant Wirth also told defendant that he believed defendant had not been truthful during his December 11, 2003 interview. After some further conversation, defendant advised Agent Wirth that his employer, Capco, was providing him with an attorney and that he was scheduled to meet with the attorney on January 7th. At that time the agent terminated the conversation.

3.    January 8, 2004 Interview

On January 8, 2004, instead of testifying before the grand jury, defendant met with the government for what is referred to as a "Queen for a Day" interview. At that time, defendant, represented by counsel, signed an agreement whereby the government agreed that it would not use his statements from that interview in their case-in-chief, but could use them for cross-examination or rebuttal purposes.

As to this interview, defendant has voluntarily dismissed his motion to suppress based on the government's assurances that it will not use these statements in its case-in-chief.

6

A. <u>Parties' Contentions</u>

Defendant contends that he was in custody during his December 11, 2003 interview. Defendant further contends that the January 5, 2004 telephone conversation was a continuation of that custodial interrogation. Because these interviews were held without <u>Miranda</u> warnings, defendant contends they must be suppressed. Alternatively, defendant argues that if the Court finds that these were not custodial interrogations, the statements were nonetheless involuntary and should be suppressed.

The government agrees only that it did not give defendant <u>Miranda</u> warnings, but contends that they were not necessary because defendant was never in custody. The government further alleges that defendant's interviews were voluntarily given and that suppression is not appropriate.

We will first address defendant's contention that these interviews were custodial interrogations and that <u>Miranda</u> warnings were necessary.

1.   <u>Custody</u>

The Court agrees with the government that defendant was not in custody at the time he made statements to government agents on December 11, 2003.

If <u>Miranda</u> warnings are not given before the questioning of a person "in custody", evidence resulting from the questioning must be suppressed. <u>Miranda v. Arizona</u>, 384 U.S. 436, 444-445

(1966).  A person is in custody when he has been deprived of his freedom of action in any significant way.  Id.

The United States Court of Appeals for the Third Circuit has recently summarized the test for determining whether a person is in custody for Miranda purposes. There are "two discrete inquiries essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave." United States v. Jacobs, 431 F.3d 99, 105 (3d. Cir. 2005)(emphasis omitted). Once the Court has heard evidence regarding the circumstances of the questioning, the Court must apply an objective test to resolve the ultimate inquiry: was there a restraint on freedom of movement of the degree associated with a formal arrest. See Jacobs at 105.

There are several factors that the Court should weigh to determine if an individual was in custody. Among these is the location of the questioning. Specifically, "all 'station house' interrogations should be scrutinized with extreme care for any taint of psychological compulsion or intimidation because such pressure is most apt to exist while a defendant is interviewed at a police station." Steigler v. Anderson, 496 F.2d 793, 799 (3d. Cir. 1974).  A second factor is the information known by the officer concerning the suspect's culpability. This is important

because "[t]he more cause for believing the suspect committed the crime, the greater tendency to bear down in interrogation and create the kind of atmosphere that triggers <u>Miranda</u>, and vice versa." <u>Id</u>. A third factor is whether the officer revealed his or her belief that the individual was guilty of a crime. <u>Stansbury v. California</u>, 511 U.S. 318, 325 (1994). Applying these factors to the facts of this case, it is clear that defendant was not in custody at the time of the December 11, 2003 interview.

At a hearing before this Court on May 24, 2007, defendant testified that he was not restrained, he was not handcuffed, and he was not placed under arrest. Defendant left the interview room on at least one occasion to retrieve and copy documents. Defendant was free to leave, and did in fact leave, to pick up his daughter. Based on this evidence, it cannot be said that defendant's freedom of movement was restrained to the degree associated with a formal arrest.

We note that the interview was held in a conference room in defendant's own place of employment and not in any kind of "station house." The federal agents who conducted the interview did not believe that defendant Monte was a target of the investigation or a suspect of any crime. In fact, the agents followed an outline prepared for employee interviews. Indeed, several employees were interviewed at that time – none were arrested. For example, Agent Eaton testified that he "did the

interview pretty much from the outline asking the questions in a rather neutral manner." Defendant was never told that he was a suspect of any crime.

Although the agents did have their badges and weapons visible, they were not wearing typical police uniforms. Based on defendant's own testimony, we find that the interview was "cordial," that he never felt threatened or coerced, although the whole experience was, understandably, stressful. In spite of defendant's stress, under all of the circumstances, defendant was not deprived of his freedom in any significant way. No reasonable person would perceive that he was not at liberty to terminate the interview and leave. The Court finds that defendant was not in custody when he rendered statements to agents on December 11, 2003, and therefore the motion to suppress statements from this interview  will be denied.

Defendant's motion to suppress his January 5, 2004 telephone interview depends on a finding that this was a "continuation" of the custodial interrogation that occurred on December 11, 2003. Based on our finding that defendant's initial interview was non-custodial and that no Miranda warnings were needed, defendant's motion to suppress his January 5, 2004 statements is also denied.

    2.   Voluntary

Defendant alternatively contends that even if his initial interview was non-custodial, it was nonetheless involuntary.

10

Statements made to law enforcement officers are inadmissible into evidence if the statements are "involuntary." Jacobs, 431 F.3d at 108 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 225-226 (1973)). The burden is on the government to establish that a challenged statement was voluntary. Id. However, a "necessary predicate to a finding of involuntariness is coercive police activity." Id. (emphasis added)

Defendant contends that when Special Agent O'Donnell first asked him whether he would agree to an interview, defendant's initial response was "Do I need a lawyer?," to which Special Agent O'Donnell said something to the effect of "No, you're not under investigation." On this point we credit Special Agent O'Donnell's testimony that he did not tell defendant Monte that he did not need a lawyer because he was not under investigation, but rather that he only told defendant that Capco was under investigation.

Even assuming for the sake of argument, that defendant was specifically told that he was not under investigation, this does not transform his interview statements into involuntary statements. Contrary to defendant's assertions, the circumstances of this case are not akin to the facts of United States v. Jacobs, 431 F.3d 99 (3d. Cir. 2005). In Jacobs, defendant had been an informant for the government, and for a specific government agent, for over ten years. The government agent made

11

an implied promise to defendant that her statements regarding a drug conspiracy would not be used against her. Defendant in that case was also summoned to FBI offices without explanation, the agent was confrontational and intimidating during the interview, the agent used aggressive interrogation tactics and most importantly, defendant did not know that she was no longer an FBI informant and that she was now the target of the investigation.

This is a completely different scenario than the case at hand, where defendant agreed to be interviewed, had a very cordial interview, and was never threatened or intimidated. There was simply no "coercive police activity" in this case. Therefore, defendant Monte's motion to suppress his December 11, 2003 statements is denied. Because defendant Monte's motion to suppress his January 5, 2004 statements depends on whether the initial interview was voluntary, this motion is also denied.

## II.   Bill of Particulars

A motion for bill of particulars will be granted only when an indictment fails to provide factual or legal information which significantly impairs the defendant's ability to prepare his defense.   United States v. Rosa, 891 F.2d 1063, 1066 (3d Cir. 1989).   Moreover, "an indictment charging a statutory crime is sufficient if it substantially follows the language of the criminal statute, provided that its generality does not prejudice

12

a defendant in preparing his defense nor endanger his constitutional guarantee against double jeopardy." United States v. Eufrasio, 935 F.2d 553, 575 (3d Cir. 1991).

Upon careful review of the indictment and defendants' allegations of the deficiencies in that document, the court concludes that there is no need to require the government to set forth a bill of particulars in this case.   The fifty page indictment adequately informs defendants of the nature of the charges against them, provides them with notice of the specific statutory crimes, and describes the scope, dates, and extent of the alleged criminal activity.   Accordingly, defendants' motion for a bill of particulars is denied.


III. Motion to Sever Counts

Defendant Bradica has filed a motion for severance of counts. Defendant contends that there are four main counts in the indictment: one relating to fraud at the construction of PNC Park, one relating to fraud at the construction of the Petersen Center, one relating to fraud at the Pentagon reconstruction and one relating to a tax conspiracy. Defendant argues that the evidence needed to prove each proposed count is different and that the prejudice against defendant outweighs whatever expediency there is in trying them together.

13

The government contends that defendants used a common scheme to defraud different victims using the same manner and means. The government further contends that the evidence and the witnesses would be substantially the same and <u>four</u> trials would be extremely burdensome and expensive.

Joinder of offenses is governed by Federal Rule of Criminal Procedure 8(a) which provides that:

> "The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged - whether felonies or misdemeanors or both - are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."

However, Federal Rule of Criminal Procedure 14(a) provides, in pertinent part, that:

> "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

The United States Court of Appeals for the Third Circuit has indicated that joining offenses is appropriate where there is a "transactional nexus" between the offenses, and that the relevant inquiry is usually whether "the offenses ... to be joined arise out of a common series of acts or transactions," although "[t]his need not always be the case." <u>U.S. v. Eufrasio</u>, 935 F.2d 553, 570, n. 20 (3d. Cir. 1991).

In the instant case, the government has charged defendants with fraud relating to three construction projects. According to

14

the government, defendants devised a common scheme to defraud different victims using the same manner and means. To a certain extent, these projects overlapped. The government contends that there is significant overlap between the evidence that would be used to prove each instance of fraud. As an example, the government notes that "an accurate time-sheet for a Capco employee working at PNC Park on a particular day will be offered to show that that employee could not have been working at the Pentagon on the same day." Evidence of Capco's daily operations, billing and payroll would be submitted at every trial. Moreover, witnesses that would testify about the fraud scheme and tax conspiracy would have to testify at each trial regarding the same information.

The Court agrees that these offenses, as alleged, constitute parts of a common scheme or plan. The witnesses that the government proposes to call, would in fact refer to one or more of these projects in their testimony. The evidence introduced would be substantially similar in each of these four proposed trials. We cannot say that defendants would be prejudiced by allowing these counts to be tried jointly. However, the government cost and expense of trying these counts individually would hinder judicial economy and efficiency within the justice system. Because the evidence in this case would be inextricably

15

intertwined, the motion for severance is denied. See United
States v. Sumler, 294 F.3d 579, 584 (3d. Cir. 2002).


IV.  Motion to Dismiss Count Thirty-Seven

Defendant Bradica has filed a motion to dismiss Count
Thirty-Seven of the indictment. Defendants Monte and Cousar have
joined in this motion. Defendants contend that Count Thirty-Seven
of the indictment fails to charge a single offense. Instead,
defendants argue, Count Thirty-Seven alleges three separate
conspiracies relating to the PNC Park project, the Petersen
Center project and the Pentagon project. Therefore, according to
defendants, the indictment is duplicitous and must be dismissed.[2]

Count Thirty-Seven (Conspiracy) of the indictment, reads as
follows:

"The grand jury further charges:

Paragraphs 1 through 49 of this Indictment are re-alleged
and incorporated fully herein by reference.

**THE CONSPIRACY**

88. Commencing in and around May 2000, and continuing
through and in and around December 2002, in the Western District
of Pennsylvania and elsewhere, the defendants THOMAS J. COUSAR,
CATHERINE L. BRADICA, and DANIEL D. MONTE, did knowingly and
willfully conspire, combine, confederate, and agree, together,
with one another and with other persons known and unknown to the
grand jury, to commit the following offenses against the United

---

[2] Defendant Bradica's motion originally alleged that Count
Thirty-Seven is multiplicitous, but at oral argument defendant
explained her intention to argue that the count was
duplicitous.

States, the objects of said conspiracy being violations of Title 18, United States Code, Sections 1341 and 2, and Title 18, United States Code, Sections 1031 and 2, respectively:

      A.   To use the United States mail in furtherance of a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises; and

      B.   To execute and attempt to execute a scheme and artifice to defraud and to obtain money and property from the United States by means of false and fraudulent pretenses, representations, and promises in connection with a prime contract with the United States valued at $1,000,000, or more.

### OVERT ACTS

    89.  In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators did do and cause to be done, the acts set forth in Paragraphs 51 through 87 of this Indictment, on the dates, at the places and in the manner set forth therein, all of which are incorporated herein by reference as separate overt acts.

    In violation of Title 18, United States Code, Section 371."[3]

Duplicity is the joining in a single count of two or more distinct separate offenses. United States v. Starks, 515 F.2d 112, 116 (3d. Cir. 1975). The Court of Appeals for the Third Circuit has identified a number of concerns regarding duplicity. "Duplicitous counts may conceal the specific charges, prevent the jury from deciding guilt or innocence with respect to a particular offense, exploit the risk of prejudicial evidentiary

---

[3] Paragraphs 1-49 and 51-87 of the indictment include allegations and charges against all defendants regarding all three projects.

rulings, or endanger fair sentencing." United States v. Haddy, 134 F.3d 542, 548 (3d. Cir. 1998)(internal citations omitted).

In this case, defendants contend that Count Thirty-Seven is duplicitous because it charges defendants with conspiracy to commit fraud with respect to three different projects. Defendants, therefore, contend that the government should have charged them with one conspiracy count for each construction project. We disagree.

"A single agreement to commit several crimes constitutes one conspiracy." United States v. Broce, 488 U.S. 563, 570-571 (1989). Count Thirty-Seven charges defendants with conspiring to commit two different offenses, mail fraud and major fraud, with respect to three different projects.  The count is perhaps not a model of clarity, but it is not duplicitous just because it alleges a conspiracy to commit more than one crime.  Any potential for confusion to the jury can be remedied with appropriate jury instructions. On this basis, defendants' motion to dismiss Count Thirty-Seven is denied.[4]

---

[4] We are concerned that Count Thirty-Seven charges defendants with conspiracy to commit offenses "against the United States," and then incorporates as overt acts done in furtherance of the conspiracy, all of the charges against defendants in the Petersen Center project and the PNC Park project. We are unclear as to how using the mail to commit fraud against private parties furthers a conspiracy to commit fraud against the United States. However, because the parties have not raised or briefed this specific issue, we decline to address it at this point. The parties are free to raise this
(continued...)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal Action No. 06-07 |
| | ) | |
| DANIEL D. MONTE, | ) | |
| THOMAS J. COUSAR, | ) | |
| CATHERINE BRADICA, | ) | |
| Defendants. | ) | |

ORDER

Therefore, this /3th day of June, 2007, IT IS HEREBY

ORDERED that defendant Monte's Motion to Suppress [document #68]

is DENIED.  IT IS FURTHER ORDERED that defendant Monte's Motion

for a Bill of Particulars [document #67] is DENIED.

IT IS HEREBY ORDERED that Defendant Bradica's Motion to

Sever Counts [document #75] is DENIED.  IT IS FURTHER ORDERED

that defendant Bradica's Motion To Dismiss Count 37 of the

Indictment [document #77] is DENIED.

BY THE COURT:

_____, J.

cc:  All Counsel of Record

_____

[4](...continued)
issue by filing an appropriate motion.

19